UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES WOOD, | No. 2:14-cv-01421-KJM-CKD |
| Plaintiff, | |
| v. | ORDER |
| SOUTHWEST AIRLINES CO., and DOES 1 through 25, inclusive, | |
| Defendants. | |

The matter is before the court on Defendant Southwest Airlines' *Daubert* motion to preclude Dr. Vinay Reddy and Dr. Stephen Rapaski from testifying at trial regarding the cause of Plaintiff's alleged injuries. At hearing on the motion, which the court joined with the pretrial conference, Edward Schade appeared for Plaintiff Charles Wood. Rebekka Martorano and Timothy Ryan appeared for Defendant Southwest Airlines. *See* ECF Nos. 26, 28, 34, 40. For reasons explained below, this motion is GRANTED, although the doctors will be allowed to testify as treating physicians. Granting the *Daubert* motion has the effect also of granting defendant's equivalent motion in limine no. 3.

I. BACKGROUND

On May 12, 2012, Plaintiff Charles Wood was a passenger on a Southwest Airlines flight. *See* Compl. at 6, ECF No. 1-1; *see also* Joint Pretrial Statement ("Statement") at

1

1  2, ECF No. 29.  While on the plane, a laptop bag fell on Mr. Wood's head.  *Id.*; *see also* Rapaski
2  Dep. at 73:4–5.  Mr. Wood alleges he sustained head injuries as a result.  Compl. at 6.

3  Mr. Wood filed his complaint on April 23, 2014 in the Superior Court of the
4  County of Sacramento, alleging negligence on the part of Southwest Airlines.  Compl. at 3.  On
5  June 13, 2014, the matter was removed to this court.  ECF No. 1.

6  In the Joint Pretrial Statement, Plaintiff contends he suffered several injuries as a
7  result of the May 12, 2012 incident.  Statement at 3.  Specifically, Mr. Wood contends he
8  sustained a "traumatic brain injury with post-concussive syndrome and resulting cognitive deficits
9  as well as impaired speech."  *Id.*  Additionally, Mr. Wood contends the incident exacerbated prior
10  musculoskeletal injuries in his cervical and upper back region.  *Id.*

11  In support of these contentions, Mr. Wood has signaled his intent to call two
12  expert witnesses at trial, Dr. Stephen Rapaski, Ph.D., and Dr. Vinay Reddy, M.D.  Pl.'s Expert
13  Disclosure 1–2, ECF No. 19.  According to Plaintiff's disclosures, Dr. Reddy is "expected to
14  offer medical testimony on the issues of causation, medical care and treatment, costs of medical
15  care, and need for future care and treatment."  *Id.* at 2.  Dr. Rapaski is expected to offer medical
16  testimony "regarding his neuropsychological evaluation conducted over the course of seven (7)
17  visits from August 5, 2013 through Decem[b]er 12, 2013," as well as opine that Plaintiff's post-
18  concussive syndrome is "related" to the incident.  *Id.*  Although Plaintiff's counsel at hearing
19  suggested he would call the doctors as treating professionals only, *see also* ECF No. 37
20  (barebones statement of non-opposition to third in limine motion), the court reaches the merits of
21  Defendant's motion given the prior filings.

22  Specifically, Southwest moves to preclude Dr. Reddy and Dr. Rapaski from
23  testifying about the cause of Plaintiff's alleged injuries, including any apportionment between or
24  among different causes.  Def.'s Mot. Exclude ("Mot."), ECF No. 21; *see also* Def.'s Mot. In
25  Limine No. 3, ECF No. 32.

26  II.     LEGAL STANDARD

27  Under Federal Rule of Evidence 701, a witness is authorized to provide opinion
28  testimony that is "(1) rationally based on the witness's perception, and (2) helpful to clearly

understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701.  If an opinion witness's testimony is based on "scientific, technical, or other specialized knowledge," admissibility of the opinion is governed by Rule 104, a general rule regarding preliminary questions a court must address, and Rule 702, the rule governing expert opinions.  Fed. R. Evid. 104, 702  Taken together, Rules 104 and 702 focus attention on whether the expert witness is qualified to testify, whether such testimony is relevant, and whether such testimony is reliable.  *Id.*; *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert I*"), 509 U.S. 579, 594–95 (1993).

In assessing whether an expert has the appropriate qualifications, the court considers whether the expert offers some special knowledge, skills, experience, training, or education on the subject matter of the testimony contemplated.  Fed. R. Evid. 702; *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  If an expert is not qualified to render an opinion on a particular question or subject, it follows her opinion cannot assist the trier of fact with regard to that particular question or subject.  *Morin v. United States*, 534 F. Supp. 2d 1179, 1185 (D. Nev. 2005), *aff'd*, 244 F. App'x 142 (9th Cir. 2007) ("Just as a lawyer is not by general education and experience qualified to give an expert opinion on every subject of the law, so too a scientist or medical doctor is not presumed to have expert knowledge about every conceivable scientific principle or disease.").  In assessing whether the expert's testimony will be relevant, the opinion must "logically advance[] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995).  The basic standard of relevance is a liberal one.  *Daubert I*, 509 U.S. at 587.

Scientific evidence is reliable if the principles and methodology used by the expert proffering it are supported by "appropriate validation" or "good grounds."  *Id*.  In *Daubert I*, the Supreme Court provided a non-exhaustive list of factors for determining whether scientific testimony is sufficiently reliable to be admitted into evidence, including (1) whether the theory or methodology can be and has been tested; (2) whether "the theory or technique has been subjected to peer review and publication"; (3) the "known or potential rate of error;" (4) the "existence and maintenance of standards controlling" the methodology's operation; and, finally, (5) general acceptance in the relevant community.  *Id.* at 593–94.

3

1  *Daubert II* elaborated on the *Daubert I* factors, clarifying that experts may demonstrate scientific reliability of a theory or methodology by showing "the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Daubert II*, 43 F.3d at 1318. Alternatively, testifying experts may also show the validity of a theory by explaining "precisely how [the experts] went about reaching their conclusions and point[ing] to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at 1319.

In determining reliability, "the expert's bald assurance of validity is not enough," *id.* at 1316, a rule meant to ensure "junk science" is kept out of the federal courtroom. *Id.* at 1321 n.18. Rather, "the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Id.* at 1316. The trial court is accorded wide discretion when acting as a gatekeeper for the admissibility of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151–52 (1999).

III.     DISCUSSION

As a threshold matter, it is worth emphasizing what Southwest's motion is not. Southwest's motion is not a challenge to Dr. Reddy's and Dr. Rapaski's qualifications as potential experts. It is not a challenge to the relevancy of testimony generally regarding the cause of Mr. Wood's injuries. Further, Southwest's motion is not a challenge to either doctor's conclusion as a treating doctor that Mr. Wood suffered from post-concussive syndrome. Finally, Southwest's motion is not a challenge to the propriety of testimony about the doctors' treatment before and after the May 2012 event.

Southwest's motion is a challenge to the conclusions of Dr. Reddy and Dr. Rapaski that plaintiff suffered from post-concussive syndrome because of the May 2012 event. Mot. at 2. Specifically, defendants challenge the doctors' methodologies used to support their conclusions as to causation, as not based "on sufficient data, [as] not the product of reliable

4

principles and methods, and involv[ing] no reliable application of principles and methods to this case." Mot. at 2.

A.  Dr. Vinay Reddy

Dr. Reddy first saw Plaintiff on September 17, 2012, four months after the May 2012 event. *See* Reddy Dep. at 6:15–16. The scope of Dr. Reddy's treatment included addressing injuries stemming from an automobile accident in 1996 as well as purported injuries stemming from the incident in May 2012. *Id.* at 8:22–9:1.

At his deposition, Dr. Reddy testified that at the time he saw Plaintiff he was aware Plaintiff had some pre-existing issues and had taken medicine for these issues. *Id.* at 18:11. For example, Dr. Reddy testified he knew plaintiff had a neck problem and chronic pain, and was taking several prescription medications including Oxycontin, Norco, Celexa, and Halcion. *Id.* at 18:11–21. He also noted Mr. Wood had a history of "memory lapses." *Id.* at 19:20–23. While Dr. Reddy conceded he did not have reports regarding Plaintiff's past medical conditions at the time of treatment, *see id.* at 18:11–13, he testified he eventually obtained records providing more insight into Mr. Wood's pre-existing injuries, *id.* at 18:23–25. Additionally, Dr. Reddy testified he reviewed pre-event records relating to Plaintiff's treatment, albeit to comment on medication Plaintiff was taking for an unrelated medical condition. *Id.* at 11:17–22.

In addition to reviewing Plaintiff's medical history, Dr. Reddy testified he performed a number of diagnostic tests, including an MRI of the brain, *id.* at 29:11, tests for Waddell's signs[1] to rule out symptom magnification, *id.* at 56:3–11, a mental status examination, *id.* at 19:14–16, and neuropsychological or psychological evaluations, *id.* at 19:20–25. From these tests and reviews, Dr. Reddy testified Mr. Wood had "word-searching difficulties," which were not typical side effects of his medications. *Id.* at 60:15–25. Additionally, relying also on his "clinical judgment," Dr. Reddy concluded Mr. Wood had post-concussive syndrome. *Id.* at

---

[1] Waddell's signs are used by physicians "to detect nonorganic sources, such as psychological conditions or malingering, for lower back pain." *See, e.g., Reinertson v. Barnhart*, 127 Fed. App'x 285, 289 (9th Cir. 2005) (citations omitted).

5

60:15–25. He confirmed his diagnosis after obtaining an opinion from a Qualified Medical Examiner (QME) and a neuropsychologist. *Id.* at 19:20–23.

During his deposition Dr. Reddy was shown a pre-event medical report from a November 11, 2011 visit with another doctor. *Id.* at 21:6–11. When asked whether this report changed his opinion as to causation, Dr. Reddy stated, "it doesn't change my opinion." *Id.* at 21:17. When asked to evaluate the symptoms Plaintiff exhibited after the Southwest incident and compare it to symptoms highlighted in Plaintiff's medical history, Dr. Reddy said, "I think the biggest difference really is the head injury, that he basically had an injury to his head which he felt was a post-concussi[ve] syndrome. And I think that that's primarily the [] difference." *Id.* at 19:6–11.

Southwest contends Dr. Reddy's "failure to consider Plaintiff's extensive medical history" renders his conclusion regarding causation inadmissible. Mot. at 6. Southwest notes in particular that Plaintiff's medical history reflects regular complaints of cognitive deficits, such as memory loss over a period of five years prior to the subject accident, which Dr. Reddy admits he was completely unaware of when he reached his conclusions regarding the cause of Plaintiff's cognitive problems. *See* Ostrand Decl. 5, ECF No. 21-2.

Dr. Reddy's deposition testimony shows he was aware of Mr. Wood's cognitive deficits, including memory loss. Indeed, Dr. Reddy testified he relied on Mr. Wood's "history of 'memory lapses'" when determining whether post-concussive syndrome was the proper diagnosis. Reddy Dep. at 19:20–23. Defendants' contention that Dr. Reddy was "completely unaware" of Mr. Wood's memory loss prior to the May 2012 event therefore is controverted by the facts before the court. Moreover, Dr. Reddy's methodology is not rendered invalid merely because he did not consider all of Plaintiff's "extensive medical history" before making a causation determination. The amount of evidence Dr. Reddy considered affects not the admissibility of his testimony, but the weight to assign it. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998).

The court must still determine, however, whether Dr. Reddy's methodology was supported by "appropriate validation" or "good grounds." *Daubert I*, 509 U.S. at 590. Dr. Reddy

1  considered Mr. Wood's medications, his past-history of memory lapses, as well as the incident on
2  the airplane as possible causes of post-concussive syndrome.  Dr. Reddy explained his
3  methodology in reaching a conclusion regarding the link between the May 2012 incident and
4  Plaintiff's post-concussive syndrome.  Dr. Reddy has not, however, identified an "objective
5  source" demonstrating his approach relied on a "reliable principle[] and method[]."  *See* Pl.'s
6  Opp'n ("Opp'n") 5, ECF No. 23.  Plaintiff also does not point to any learned treatise, policy
7  statement of a professional association, or a published article supporting his argument for the
8  reliability of Dr. Reddy's conclusion.

9  Without more, Dr. Redding's unadorned statement does not assist the court in
10  determining reliability.  He has not clarified why the May 2012 incident was "ruled in" as a
11  plausible cause of Mr. Wood's post-concussive syndrome.  *See Hollander v. Sandoz Pharm.*
12  *Corp.*, 289 F.3d 1193, 1210 (10th Cir. 2002) ("In order to "rule in" [this drug] as a scientifically
13  plausible cause of Ms. Hollander's stroke, the Hollanders' experts would need to present reliable
14  evidence that the drug can cause strokes.").  The mere fact that two events correspond in relative
15  time or space does not necessarily mean they are causally related.  *Clausen v. M/V NEW*
16  *CARISSA*, 339 F.3d 1049, 1059 (9th Cir. 2003).  On the record before the court, under *Daubert I*
17  and its progeny, Plaintiff's showing is not enough.

18  Defendant's motion to exclude Dr. Reddy from providing causation testimony is
19  GRANTED.

20  B.  Dr. Stephen Rapaski

21  Dr. Rapaski first saw Plaintiff in August 2013, about fifteen months after the May
22  2012 incident.  *See* Rapaski Dep. at 49:9–11. The scope of Dr. Rapaski's treatment included
23  injuries purportedly stemming from that incident.  *Id.* at 20:14–22.

24  At his deposition, Dr. Rapaski testified he was not aware Plaintiff had been
25  receiving treatment for injuries sustained in the 1996 accident.  *See id.* at 20:14–17.  Additionally,
26  Dr. Rapaski testified he did not review reports on plaintiff's medical condition prior to May 2012.
27  *See id.* at 6:15–17; 44:21–45:4.  Finally, Dr. Rapaski testified he was not aware plaintiff had
28

7

1  complained of memory loss, numbness, tingling sensations, and unsteadiness since at least
2  November 2011.  *Id.* at 46:21–25.
3       During his treatment, Dr. Rapaski relied on reports from Dr. Reddy.  *Id.* at
4  38:6-18.  Additionally, Dr. Rapaski conducted a patient interview, reviewed test scores,
5  interpreted scores, impressions, diagnosis, and drafted his conclusions.  *Id.* at 29:12–30:17,
6  39:18–40:18.  Dr. Rapaski testified "there was no evidence of pre-injury that I know of,
7  [including] pre-injury neurologic problems."  *Id.* at 38:6–18.  On the basis of these findings,
8  Dr. Rapaski made his diagnosis of post-concussive syndrome.  *Id.* at 44:3–13.
9       As with Dr. Reddy, defendants contend Dr. Rapaski's methodology is flawed.
10 Defendants contend Dr. Rapaski too was "unaware of over twenty instances over the course of
11 many years before the subject accident when Plaintiff complained of cognitive issues such as
12 headaches, memory loss, and speech difficulties."   ECF No. 21-1 at 10.  Defendants contend
13 Dr. Rapaski's having not reviewed past reports renders his testimony of causation inadmissible.
14 *Id.*
15      As with Dr. Reddy's testimony, the court must determine whether Dr. Rapaski's
16 testimony is supported by "appropriate validation" or "good grounds."  *Daubert I*, 509 U.S. at
17 590.   Unlike Dr. Reddy, Dr. Rapaski did not consider Plaintiff's medical history before
18 concluding Mr. Wood had post-concussive syndrome.  Nothing before the court shows
19 Dr. Rapaski "ruled in" or ruled out plausible causes of Mr. Wood's post-concussive syndrome.
20      Moreover, the plausibility of Dr. Rapaski's opinions cannot be determined because
21 Plaintiff has not identified an "objective source" showing Dr. Rapaski's approach was based on a
22 "reliable principle[] and method[]."  Opp'n at 8.  Dr. Rapaski's testimony too is supported merely
23 by a "bald assurance of validity."  *Daubert II*, 43 F.3d at 1316.  This showing is insufficient to
24 support his expert testimony.
25      Defendant's motion to preclude Dr. Rapaski from giving causation testimony is
26 GRANTED.
27 /////
28 /////

IV.     CONCLUSION

Defendant's motion to exclude Dr. Reddy's expert testimony on causation is GRANTED.  Defendant's motion to exclude Dr. Rapaski's testimony on causation also is GRANTED.

This order resolves ECF Nos. 21 and 32.

IT IS SO ORDERED.

DATED: February 20, 2016.

_____
UNITED STATES DISTRICT JUDGE